UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS ESPINOZA, JR., <br><br> Petitioner, <br><br> v. <br><br> PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Respondent. | Case No. 1:17-cv-00705-DAD-JDP (HC) <br><br> FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS <br><br> ECF No. 1 <br><br> OBJECTIONS DUE IN 14 DAYS |

Petitioner Carlos Espinoza, Jr., a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. He raises one habeas claim, alleging that he has received ineffective assistance of counsel. We recommend that the court deny the petition.

**I.  Background**

Petitioner attacked several people, believing that his ex-girlfriend, Elisa Mejia, had had an affair with a man by the name of Steven Mendoza. Petitioner stabbed Mendoza, killing him, and turned a taser on several bystanders. The government charged petitioner with first-degree murder, attempted murder, and assault. Given the charges and his two prior strikes, petitioner faced life in prison without the possibility of parole.

This case arises from petitioner's plea negotiations with the government. The prosecutor offered petitioner a plea deal in which the government would recommend a sentence of fifty-five years to life in prison if petitioner would plead guilty to voluntary manslaughter and certain other

offenses. Petitioner's trial attorney then went on medical leave and eventually retired. The public defender's office assigned petitioner a second attorney, who did not notice the reference in his predecessor's notes to the government's most recent offer, and who emailed the prosecutor rejecting a prior offer and proposing a resolution on different terms. The prosecutor construed the second attorney's offer as a rejection of the government's most recent offer. The public defender's office eventually replaced this second attorney with a third attorney, who took up the reins in plea negotiations. Ultimately, petitioner entered into a plea agreement, admitted his two prior strikes, and pleaded no contest to one count of second-degree murder and one count of assault with a deadly weapon. The government dismissed all other counts. The Tulare County Superior Court sentenced petitioner to fifty-five years to life. The parties agree that petitioner's conviction and sentence are the same as the terms of the plea offer rejected by petitioner's second attorney, except that petitioner pleaded guilty to second-degree murder instead of the less serious offense of voluntary manslaughter.

We set forth below the facts of the underlying offenses, as stated by the Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> The testimony at the preliminary hearing established that Mejia dated defendant for about three months, but the dating relationship had ended about a month before the date in question. On the date in question, Mejia and her sister-in-law planned to attend a wedding and then celebrate her sister-in-law's birthday. Mejia asked defendant to accompany them as the sober driver. The three attended the wedding and then went to a bar. Four men with whom Mejia's sister-in-law worked, were at the bar. The two groups merged, and after the bar closed went to Thomas Manning's apartment, one of the men in the group. The group continued to drink and talk. Defendant became upset when one of the men showed some affection towards Mejia. Mejia and her sister-in-law took defendant home, and then returned to the apartment.
>
> About 20 minutes later, defendant returned to the apartment and knocked on the door. When one of the men, David Chavez, opened the door, defendant stunned him with a Taser. Mejia walked to the door and defendant grabbed her and pulled her towards the elevator. Mejia's sister-in-law attempted to intervene on Mejia's behalf. Defendant used the Taser twice on Mejia and twice on her sister-in-law as they struggled to escape from defendant. Mejia and her sister-in-law eventually escaped from defendant and returned to the apartment. Defendant apparently left the building.

Later that night, Mejia and Mendoza ended up in the bedroom of Manning's apartment. Defendant returned to the apartment and entered the bedroom. Mendoza and defendant began fighting. Mejia attempted to separate the two men. Defendant eventually ran out of the bedroom. Mendoza attempted to follow defendant, but fell down near the entrance door. He was bleeding and eventually died of multiple stab wounds, 24 in total. Mejia was stabbed near her armpit during the altercation.

Chavez testified he was with the group of men that encountered Mejia and her sister-in-law at the bar that night. He recalled returning to Manning's apartment and the party continuing. He also recalled the women taking defendant home and then returning to the apartment. Eventually, Chavez returned to his apartment, which was on the same floor as Manning's apartment. Later Chavez exited his apartment and encountered defendant. Defendant stabbed Chavez seven times and then went inside Manning's apartment.

The information charged defendant with the following: (1) first degree murder of Mendoza with a lying in wait special circumstance, (Pen. Code, §§ 187, subd. (a) and 190.2, subd. (a)(15));1 (2) the attempted murder of Chavez (§§ 187, subd. (a) and 664); (3) assault with a deadly weapon with Mejia as the victim (stabbing) (§ 245, subd. (a)(1)); (4) assault with a deadly weapon with Mejia as the victim (Taser) (§ 245, subd. (a)(1)); (5) assault with a deadly weapon with Chavez as the victim (Taser) (§ 245, subd. (a)(1)); and (6) assault with a deadly weapon with the sister-in-law as the victim (Taser) (§ 245, subd. (a)(1)). The information also alleged the following enhancements: (1) use of a deadly weapon within the meaning of section 12022, subdivision (b)(1) (counts one and two); (2) two prior strike convictions within the meaning of section 667, subdivisions (b)-(i) (all counts); (3) two prior serious felony convictions within the meaning of section 667, subdivision (a)(1) (all counts); and (4) one prior prison term within the meaning of section 667.5, subdivision (b) (all counts).

The information was filed on February 13, 2014. Defendant was represented by the public defender's office, specifically by Deputy Public Defender Neal Pedowitz, at the preliminary hearing. Defendant was arraigned on February 24, 2014, again represented by Pedowitz. On September 3, 2014, defendant requested a Marsden hearing seeking to have different appointed counsel to represent him. On September 17, 2014, the Marsden hearing was held and the motion was denied.

On that same day, Pedowitz filed a motion pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 seeking to have one or more of the strike allegations stricken by the trial court. Pedowitz explained the purpose of the motion was an attempt to determine the trial court's position to aid in the plea negotiations. Pedowitz believed that if the trial court struck one or more of the strikes, the two parties could reach a plea agreement that would be more favorable for defendant than the current offer by the

prosecutor. The prosecutor filed an opposition to the request, and at the October 24, 2014 hearing the trial court denied the request.

The next filing in the record is a motion to continue the trial filed on or about November 17, 2014, by Deputy Public Defender Stephen Prekoski. The motion stated that good cause existed to continue the trial because Pedowitz had fallen ill, and would not return to work until the middle of January 2015. The motion was heard on December 12, 2014, and was granted by the trial court. Defendant was present at the hearing.

A trial setting hearing was held on January 16, 2015, and defendant was represented by Prekoski. Defendant was present at the hearing, and the matter was continued until May 22, 2015. Although there is no reporter's transcript of the hearing, comments at a later hearing indicate the matter was continued because Pedowitz was still ill, and at the time was not expected to return to the office until May 2015.

The matter was again continued at the May 22, 2015 hearing. Defendant was present and represented by Deputy Public Defender Ben Smukler. No reporter's transcript of this hearing is in the record, but from later comments it appears by this time that Pedowitz had retired from the public defender's office, apparently because of his illness. Smukler was the new deputy public defender assigned to represent defendant.

The next hearing was held on June 5, 2015. Defendant was present and represented by Smukler. A trial date of July 19, 2016, was set.

On June 19, 2015, a pretrial hearing was held. Defendant was present and represented by Smukler. The trial dates were confirmed.

The next pretrial hearing was held on July 10, 2015. At this hearing, a Marsden hearing was held. Smukler began by explaining he had become aware of an issue he wanted to bring to the court's attention. He explained that defendant was facing a sentence of life without the possibility of parole, plus many additional years if he was convicted of all counts in the information and all the enhancements were found true. The public defender's file notes indicated that in June 2014, Pedowitz began plea negotiations with the prosecutor assigned to the case. In July 2014, the prosecutor offered a plea agreement which required defendant to plead to second degree murder and receive a sentence of approximately 55 years to life. Later that month, the file notes indicated that Pedowitz met with defendant and the two decided to reject the offer.

The last handwritten note in the file made by Pedowitz was after the Romero motion was denied. Shortly thereafter, Pedowitz unexpectedly became ill. Although it was initially anticipated he would return to the office, ultimately he retired. When Pedowitz became ill, the motion to continue the case was made, and Prekoski reviewed the file to determine if a plea agreement could be reached.

4

Prekoski apparently read the handwritten notes in the file and concluded defendant had agreed to reject the second degree murder plea offer. Prekoski then sent an email to the prosecutor rejecting the offer.

Prekoski was apparently unaware that Pedowitz had also made some file notes in the public defender's computer system, which apparently was very unusual for Pedowitz. Nonetheless, these notes indicated that after the Romero request was denied, Pedowitz had continued to negotiate with the prosecutor. A tentative agreement to settle the case was reached which would require defendant to plead to voluntary manslaughter, one assault count, and one five-year prior for a total sentence of 55 years to life (the voluntary manslaughter offer).

In speaking with defendant, Smukler learned that Pedowitz had met with defendant and discussed the offer. Smukler was able to confirm the meeting actually occurred, and that defendant was seriously considering the offer. However, defendant did not give Pedowitz a response because he wanted to discuss the matter with his father before he made a decision. It was anticipated defendant would call Pedowitz the following week with his final decision.

Prekoski was unaware of the voluntary manslaughter offer when he advised the district attorney's office that the current offer was rejected. The prosecutor did not realize Prekoski did not know about the voluntary manslaughter offer that was pending, so he assumed the rejection received from Prekoski referred to the voluntary manslaughter offer. As required by law, the prosecutor advised not only his supervisors of the rejection, but also the victim's family.

When Smukler assumed responsibility for the file, he reopened plea negotiations with the prosecutor. Smukler was informed the last offer was the voluntary manslaughter offer, but the prosecutor would need to obtain approval from his supervisor to make that offer again. Before the prosecutor would bring the matter up with his supervisors, he wanted to make sure defendant was willing to accept such an offer. Smukler met with defendant and informed him it was extremely unlikely that if he went to trial he would receive a sentence less than the offer made by the prosecutor. Smukler and defendant met on at least two occasions and discussed the offer and the ramifications. Defendant ultimately indicated he was interested in the offer, but again decided he wanted to discuss that matter with his father before making a final decision.

Smukler informed the prosecutor that defendant was interested in the offer. However, when the prosecutor discussed the matter with his supervisors, they rejected the offer. The prosecutor relayed that information to Smukler, but said he thought his supervisors would approve a plea agreement for the same sentence, but defendant would have to plead to second degree murder.

When Smukler relayed this information to defendant, defendant became confused. He thought the voluntary manslaughter offer

5

was the same offer that had always been on the table, not realizing that Prekoski had inadvertently rejected that offer. Defendant added that he had called the public defender's office twice shortly after the voluntary manslaughter offer had been made to inform Pedowitz he would accept the offer, but by then Pedowitz had left the office because of his illness. Smukler then accurately summarized the issue:

"And so basically the bottom line is that there was an offer. It was relayed to my client. My client did consider it and wanted to accept it, but because of the confusion surrounding Mr. Pedowitz leaving the office and the fact that he didn't write any of this in the file, Mr. Prekoski was not aware of that and we, in essence, rejected the offer out of hand without acting on our client's behalf."

Smukler then cited two cases, *Lafler v. Cooper* (2012) 132 S.Ct. 1376 (*Lafler*), and *Missouri v. Frye* (2012) 132 S.Ct. 1399, which he contended were similar cases that suggested some relief is appropriate.

The trial court also directly addressed defendant. Defendant confirmed he contacted the public defender's office to accept the plea offer, but Pedowitz was out. The trial court then continued the matter to consider the issue.

The next hearing was on July 23, 2015. Smukler began by reiterating that which had been discussed at the previous hearing, this time with the prosecutor present. The prosecutor also reviewed the sequence of events in a manner very similar to the above. He explained that in discussions with the family, he and his supervisors felt that a plea to second degree murder was necessary, but all agreed that the sentence would remain the same as in the voluntary manslaughter offer, 55 years to life (hereafter the second degree murder offer).

The trial court ultimately denied the Marsden motion, essentially because defendant did not want new counsel. Defendant stated he preferred the voluntary manslaughter offer, but reluctantly accepted the second degree murder offer. The trial court accepted his no contest plea, and sentenced defendant to the agreed upon term of a determinate term of five years, and an indeterminate term of 50 years to life.

*People v. Espinoza*, No. F072381, 2016 WL 6892244, at *1-4 (Cal. Ct. App. Nov. 23, 2016).

**II.     Discussion**

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v.*

6

*Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). On all issues decided on the merits, the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S.

7

at 99.  And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all.  *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016).  If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies.  *See Murray*, 882 F.3d at 807.

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be."  *Richter*, 562 U.S. at 102.  As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority."  *Id.* at 103 (citation omitted).  Our habeas review authority serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Id.* at 102-03 (emphasis added).

Here, petitioner raises only one habeas claim: that he received ineffective assistance of counsel.  He contends that his trial attorneys were unconstitutionally deficient when they mistakenly rejected a plea deal in which he would plead guilty to voluntary manslaughter as opposed to second-degree murder.  The Court of Appeal rejected petitioner's claim on the merits.  The California Supreme Court summarily denied review.

A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel.  *See Richter*, 562 U.S. at 105.  On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim.  *See* 466 U.S. 668, 687 (1984).  First, a criminal defendant must show some deficient performance by

counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice, which requires "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, coupled with the fairminded jurist standard of Section 2254(d), the *Strickland* requirements become even more deferential: the question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified such argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

The Supreme Court has explicitly declined to provide a list of the duties expected of trial counsel during plea negotiations, *see* Missouri v. Frye, 566 U.S. 134, 145 (2012), but the Court has recognized unconstitutionally deficient performance by counsel in egregious cases. For example, advising a criminal defendant to reject a plea offer on the basis that the government cannot show intent to kill—even though the defendant had shot a gun at a victim's head—can show *Strickland* deficiency. *See Lafler v. Cooper*, 566 U.S. 156, 160-61 (2012). Likewise, failure to inform a criminal defendant about deportation risk resulting from a guilty plea can satisfy the deficiency prong under *Strickland*. *See Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). And failing to inform a criminal defendant about the existence of a plea offer, thereby depriving the defendant an opportunity to consider the offer, can constitute unconstitutionally deficient performance. *See Frye*, 566 U.S. at 145. Because no bright line rule exists to evaluate counsel's performance during a plea negotiation, the standard that applies here is a general one: criminal defendants are entitled to effective assistance of counsel during plea negotiations. *See id.* at 144 ("[C]riminal defendants require effective counsel during plea negotiations. 'Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him.'") (quoting *Massiah v. United States*, 377 U.S. 201, 204 (1964)). "When applying such general rules, [state] courts have 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Atwood v. Ryan*, 870 F.3d 1033, 1049 (9th Cir. 2017) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

9

As for the prejudice inquiry in plea-bargain cases, the Supreme Court has given the lower courts a three-part test. To show *Strickland* prejudice in this context, a criminal defendant must show: (1) a reasonable probability he would have accepted the earlier plea offer had he been afforded effective assistance of counsel; (2) a reasonable probability that the plea agreement would have been entered without being withdrawn by the prosecution; and (3) a reasonable probability that the trial court would have accepted the parties' plea agreement. *See Frye*, 566 U.S. at 147. The ultimate form of *Strickland* prejudice in the plea-bargain context can be either a more serious charge or a greater sentence. *Id.*

### a. Petitioner's Plea Negotiations

We begin with the chronology of events, which is particularly important in this case. The prosecutor initially offered a plea deal in which petitioner would plead guilty to second-degree murder; petitioner, with the help of his first attorney, Neal Pedowitz, rejected that offer. RT 3:206.[1] The prosecutor and attorney Pedowitz later reached a "tentative agreement," RT 3:209, for petitioner to plead guilty to a lesser offense, voluntary manslaughter—instead of second-degree murder—and to serve a total term of fifty-five years to life in prison. *Id.* Attorney Pedowitz presented the offer to petitioner, who said he wanted time to discuss it with his father before deciding whether to accept it. CT 1:230. Attorney Pedowitz then went on medical leave, and petitioner's second attorney, Stephen Prekoski, was assigned to the case. RT 3:214.

Attorney Prekoski reviewed petitioner's paper-format case file, but missed some pertinent notes that Pedowitz had saved electronically. CT 1:227. The parties agree that the public defender's office where attorneys Pedowitz and Prekoski had worked ordinarily stored client files in paper form and that it was unusual for an attorney to keep separate notes on a computer. CT 1:226-28. Attorney Prekoski did not see the notes on the computer about the pending voluntary-manslaughter offer, and mistakenly believed that he was responding to an earlier second-degree-murder offer when he sent an email to the prosecutor. *Id.* The record does not contain the email,

---

[1] All "RT" citations refer to the reporter's transcript. All "CT" citations refer to the clerk's transcript. Respondent has electronically filed these documents. *See* ECF No. 11-1 at 1 (CT), 334 (RT).

10

but here is how petitioner's third attorney, Ben Smukler, described its content:

> Mr. Prekoski sent an email to the District Attorney saying, basically, that there are what he referred to as "scant" file notes, and, again, he's referring to the paper file; that he sees some reference to an offer of 50-to-life; that he doesn't know if that was conveyed, meaning conveyed to our client, but that *realistically that would not settle the case and that if the Prosecutor was interested in talking about something like filing it with one strike that they could talk about that, but, otherwise, it would just have to go to trial*.

CT 1:231 (emphasis added). The parties agree that attorney Prekoski was unaware of the pending voluntary-manslaughter offer when he sent this email. Although the record does not show that the email explicitly rejected the offer, the prosecutor understood the email as a rejection of the pending voluntary-manslaughter offer. *Id*.

Petitioner then got a third attorney assigned to his case, attorney Ben Smukler, who resumed plea negotiations. The parties again discussed a plea deal in which petitioner would plead guilty to voluntary manslaughter, but the prosecutor said he needed to know whether petitioner would accept such a plea. CT 1:232. Attorney Smukler met with petitioner, informing him about a potential, new voluntary-manslaughter plea. *Id*. Petitioner responded that he would need to talk his father before accepting the offer; he did not tell attorney Smukler that he accepted the offer, even though he "expressed his interest" in doing so. *Id*. Attorney Smukler informed the prosecutor that petitioner was interested in a voluntary-manslaughter plea, but the prosecutor then said his superiors would not agree to it; petitioner, it seems, had missed his chance. *Id*. Petitioner ultimately pleaded guilty to second-degree murder and other offenses, for a total term of fifty-five years in prison. CT 1:280-81, 289-90.

**b. Analysis**

Petitioner alleges that he was denied his constitutional right to counsel because the attorneys from the public defender's office mistakenly rejected the plea deal in which he would plead guilty to voluntary manslaughter rather than second-degree murder. ECF No. 1 at 23. Petitioner does not allege any deficiency other than the rejection of the voluntary-manslaughter plea offer, and he does not explain how each of his three trial attorneys took part in rejecting the offer. The only attorney who arguably rejected the plea offer was his second trial attorney,

11

Prekoski. The Court of Appeal focused on attorney Prekoski's conduct and found no constitutional deficiency or prejudice. We reject petitioner's claim of ineffective assistance of counsel for his failure to show prejudice.[2]

Petitioner contends that he would have accepted the manslaughter plea offer but for attorney Prekoski's mistaken rejection of the offer. Petitioner alleges that he called the public defender's office to accept the offer before the mistaken rejection, but attorney Pedowitz was not available. He does not deny that he would have received the same sentence—fifty-five years to life in prison—if he had accepted the manslaughter plea-offer, but he argues that he would have a greater chance of obtaining early parole.[3] Despite petitioner's insistence he tried to accept the manslaughter plea-offer, a reasonable jurist could conclude otherwise.

After the rejection of the manslaughter plea-offer, the attorneys on both sides revisited the possibility of a plea deal with the same or very similar terms. CT 1:232. Petitioner again told his trial attorney that he would need more time to discuss with his father before accepting the offer. *Id*. Petitioner does not explain why he needed to consult his father again if he had already called the public defender's office to accept an equivalent offer. Petitioner also appeared in court with his third trial attorney—within one month of his purported decision to accept the manslaughter plea-offer—to continue the trial date. CT 1:203. If petitioner had attempted to accept the manslaughter plea-offer before that court appearance, he might be expected to have informed counsel before or at the hearing—in which case it would not have been necessary to seek a continuance.[4] Only several months after the purported attempt to accept the offer did petitioner inform his attorney for the first time that he wished to accept the manslaughter plea-offer.

---

[2] We express no opinion whether petitioner's trial counsel's performance was constitutionally deficient.

[3] Before the state trial court, petitioner argued that he would be placed in a more desirable facility if he was convicted of manslaughter as opposed to murder. He does not raise that argument in this habeas proceeding.

[4] We have considered the possibility that petitioner appeared in court to continue the trial date because he did not know that trial was unnecessary if he accepted the plea offer. Such confusion was unlikely; petitioner had the assistance of counsel and had an extensive history with the criminal justice system. CT 1:307-08, 312.

CT 1:233. Although the record does not indicate the precise date when petitioner informed attorney Smukler about his intent to accept the manslaughter plea-offer, we know that at least six months had passed since the purported acceptance of the offer, which was in November 2014; attorney Smukler was assigned to represent petitioner in May 2015. CT 1:230.

In sum, a reasonable jurist could conclude that petitioner had not shown the requisite deficiency or prejudice under *Strickland*. The court should deny the petition in its entirety.

### III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

### IV. Findings and Recommendations

We recommend that the court deny the petition and decline to issue a certificate of appealability. Under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California, we submit the findings and recommendations to the U.S. District Court Judge presiding over the case. Within fourteen days of the service of the findings and recommendations, any party may file written objections to the findings and recommendations. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The presiding District Judge will then review the

findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated: August 14, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202